Scott McNutt, David Johanson, and Douglas Rubel here for Appellants, and Scott Gauthier here for Appellees. All right. So Mr. McNutt is arguing principally, and do you wish to reserve time? I wish to reserve two minutes. All right. Thank you. Thank you, Your Honor. You may commence. Judge Taylor, Judge Gannon, Judge Lafferty. This case has truly tested my soul, my belief in the system, the integrity of the system, the integrity of the court system. I personally have filed six ESOP cases in the state of California. All of them were successful. None of them resulted in any appeal of any kind, because I think I know the terrain pretty well. That includes the most successful ESOP case ever filed in California, maybe the nation. This case is a problem. Let me put it on the headline of the New York Times, and this is of particular interest to Judge Gannon. CPES, C-P-E-S, is Community Provider of Enrichment Services. For 45 years, it provided mental health services to the severely disabled in the state of Arizona. It was owned for the last more than 35 years by what amounted to ultimately 1,300 minimum wage workers, some of whom worked at CPES for 40 years. The headline would be, 45-year-old Arizona Corporation Files for Bankruptcy in Santa Barbara, Wipes Out Interests of 1,300 Pension Holders. Pension holders were not given any voice in the process, because management hired someone who would speak for them and who worked at the direction of management. Can I ask you a couple of questions about what this is really about? Yes, sir. Putting aside the idea that it was somehow a mystery to all these people that the company was in enough financial trouble that it would have filed a bankruptcy, putting that aside for a second, the company files a bankruptcy. They sell assets. Now, I know you're not happy about that, but I'm not exactly sure if you're making a notice argument. And I guess more practically, I'm asking myself, what if you would have opposed that sale motion? What do you think the result would have been? Sure. Because let me tell you what happens, right? The creditors would have said, you know, we'd really like to see a sale. And equity loses that argument 101 out of 100 times. So do you have a theory on which the sale wouldn't have occurred? I have a big issue and a couple of smaller issues. The big issue is we had no one to negotiate with over any issue. Because the trustee, who was the steward. That's not answering my question. Yes, it is. Well, I'm sorry, Judge Lankford. OK. You can tell me it is. Let me take another stab at it. The assets sold for, let's say, $12 million. There have been $7 million in administrative expenses. It was sold to a corporation with which CIPAS had been in active negotiations for over a year. Maybe they would have preferred to sell this thing out of bankruptcy. Maybe there was no purpose served by the bankruptcy other than immunizing the estate, the planned fiduciaries, and the directors and officers from liability. Your position is, had you made those arguments, the court would have said, I don't care what equity, I don't care what creditors think, I'm going to do that, I'm going to dismiss this case. Judge Lafferty, you know I have a lot of respect for you. So let me back up as clearly I've not been articulate. Under the Merrimack case, which is a U.S. Supreme Court case, the court says, you know, once you are not an employee anymore, you don't have the indicia of being a shareholder. And your rights in these cases are the rights of unsecured creditors. Okay. I think that's a whole other argument, but I hear you. Let me go on to the next step. So we get to plan time and you don't like the voting. Assume for a moment Class VI would have rejected. What do you suppose would have happened? We would have negotiated the transfer of the derivative rights. Well, can I, let me just, tell me why the plan doesn't confirm whether you consent or not. You're at the bottom of the totem pole. You get what's left. Not under Merrimack. Okay. But that assumes that we have to agree with you that you're unsecured creditors. That's right. Okay. All right. And we don't have the right to make that argument. Okay. When would we make that argument? Okay. Well, you made it and you lost it, but there you go. Okay. You see what my problem here is? Not yet, Your Honor. At the end of the day, unless you guys are something other than equity, why does any of this matter is my question. I think I understand the answer and I'll try to answer it. Sure. If we had some vote or some role, we would have negotiated for the things that might have brought value to our constituency. And are those things gone now? Well, in two and a half years, the derivative claims have not been prosecuted or assigned to us. I've been carrying this case. Are they discharged? Excuse me, counsel. Counsel, I'm sorry to bother you. Yes, sir. You need to just stand, no, it's okay. You just need to stand in front of the microphone when you not wander because we're missing about half of the argument. As you move around the room, it's just not picking it up. So if you could, and I know this is probably not your style, but if you could just keep at the podium and lean into the microphone, that would really help the audio. I apologize, Judge Kahn. Not to worry. So hold on to the – Yeah, hold on to it and just – I guess you can sway but not step is the answer. The problem I have, Judge Kahn, is that I'm getting older and it's freezing in here. It's true. That's why I'm here and you're there. But so the main argument, just to go back, is that you're really creditors, and we have to agree with you on that for a lot of this to matter, right? Some or all of us are creditors. I get that. I get that. Okay. Some or all of us are creditors. Yeah. And we could say, you know, we're going to give up those arguments to being creditors if you assign the derivative rights so we can get going with this D&O litigation, which is what has happened in every other case like this I've ever seen. But we can't because we have someone that's purporting to represent us that can't represent us. By statute, he can't represent us. And that's, to me, outrageous, simply outrageous. You ask a good question. If we had a voice, if we had a budget, if we had rights of some kind, if our interests weren't being protected by a planned fiduciary who has absolutely no mandate other than to do what he's told by management, we could go and we could say, you know, putting these third-party releases, again, in all these documents is outrageous. It's contrary to law. And there should be some punishment for that. So you disagree with the APOE that their exculpation clause is having to do with the conduct of the bankruptcy? Three points. First, the debtors, Mr. Godier had nothing to do with this. All the events in this case happened well before he came on the scene. And the lawyers that charted this course are not here. First, debtors filed a plan of disclosure statement which gave third-party releases to all planned fiduciaries, all directors, and all officers. We, at our own expense, objected and said, this is contrary to Ninth Circuit law. This is impossible, Your Honor. The judge said, well, I don't have to deal with that because as soon as you filed your objections, they just rewrote the documents. Golly. I had an incidental role in the Neiman Marcus case last year, the year before. The mind grows weary. In that case, a creditors committee member made two phone calls trying to rig the bidding so he could buy some Neiman Marcus assets. The judge made a referral, he was charged, and he was prosecuted. So is this about, I mean, if this is about righteous indignation and wanting to put people in jail or that sort of thing, I think we're kind of getting beyond our mandate here. So I think the jury argument should, you know, save it for another day because we've got a tough road to hoe here, and we're not going to tell the judge you have to make a criminal referral. That just isn't going to happen. Righteous indignation and injured innocence are not easily— I understand. I'm just saying I'm reacting negatively to that because it's not helping me get where you want me to get or where I think I need to get because— Your Honor, I want to get you where you want to get. Well, good on you. Let me ask a different kind of question then as we're looking at this. You are very concerned about how this thing started, but you're not arguing at the end of the day that these broad releases survived. They didn't, correct? No, they did not. Okay. Because we got them removed—I didn't mean to talk over you. So good on you. Good on you. We got them removed three times. Okay. Good on you. And you're painting the plan fiduciary as darkly as you can, but he doesn't have a release. He doesn't have any protection under this plan, does he? Yes or no? Yes, he does. I received a letter from the so-called plan administrator in this case, which is a gentleman in Wisconsin of all places, saying if you file a complaint and it names anyone in this case, we will argue that the exoneration provisions may apply to them, and we will seek sanctions against you. Now, I think he's wrong, but I've carried this case for two years. Do I want to invite myself into another lawsuit? There's still $4 million in the bank that they can spend fighting over these issues as they try to defend the plan fiduciaries, the directors, and the officers, all of whom have the same names in this case because they all overlap. Okay. Go ahead. No, go ahead, Judge Gant. So my question is what you are looking for here is to become creditors instead of equity, to appoint a Chapter 11 trustee rather than to have the current management or equity, whoever is running the show, run the show. And you really want to have an opportunity to vote and defeat this plan and start the process completely again. Is that a fair statement? No, Your Honor. That is not what I'm after. I think too much water has passed under the bridge to do that. I think this plan should be rescinded, and I think if the Fagree firm and Miguel Paredes were removed from the scene, our group would sit down with the unsecured creditors, which are very few in number. That second piece of this, though, isn't something we can do in the context of this appeal. I mean, that's just, you know, so if that's part of it, so what can we do? But the VAP could express opinions. I wanted to finish with Judge Gant, if that's all right, Judge Taylor. Sure. Go ahead. I didn't mean to interrupt you. Go ahead. Judge Gant, I think what would happen is we'd either stipulate to a Chapter 7 trustee taking the remaining assets and figure out what to do, or we'd agree to a consensual plan modification, which might be quite extensive, where we have rights, unsecured creditors have rights. Remember, in this case, there are very few unsecured creditors. There was no creditors committee because they ran this case to the end and they had cash in the bank when they filed it, and they bought D&O coverage and they paid their lawyers a million dollars. That's what happened in this case. So if this were sent back, if this were rescinded, then the only parties in interest would be the planned participants and the unsecured debt. And I am. Administrative creditors. What? And the administrative creditors. And the administrative creditors, which hopefully at that point would stop accruing fees. And this would sort itself out because what we would get is we want the derivative claims. I've prosecuted too many of these actions. We have a beautiful complaint prepared. We've been sitting on it for months because we can't. If we file it, it's going to say it's unclear to us who has the derivative rights. We think under Arizona law we have those rights because it would be futile to ask for them because this melange of conflicting interests is not going to assign them to us. But if we were able to talk to the unsecured creditors or a trustee or stipulate to a planned amendment, those rights would just come to us. They come to us in all cases. I've never seen a case where first management uses our money to try to get third-party releases. Then it amends those third-party releases. Then it prepares exoneration provisions, which are too complicated for my feeble mind to understand. And then they say, and we're hiring someone to be the planned administrator who will take direction from that self-same Miguel Paredes who has 40 undisclosed connections to Fagery Drinker and who has paid Fagery Drinker a million and a half dollars in the last three years. That's what I'm dealing with. I just want to prosecute my lawsuit and be freed of this. And they have held on too long, and some order needs to be brought here. I'm sorry. All right. Well, you've talked us up, so we'll let you go. And as I said, you're your own timekeeper. And I apologize to Judge Taylor for being so slow. No, it's your decision as to how you use your time. So I just didn't give you a warning because you were in full-throated arguments. So I think it's better to let you continue. Well, I'm a steward at heart, so you may commence. Good morning. May it please the Court. Scott Gauthier with Fagery Drinker, Biddle, and Reith on behalf of the appellees. The panel should dismiss the appeal. It is equitably moot. It presents issues that were not before the bankruptcy court, and it seeks to appeal prior orders that are not the subject of this appeal. Alternatively, the panel should deny the appeal and affirm the bankruptcy court's confirmation of the plan. The issues presented were broadly worded, and as a result, as a consequence, the papers presented meandered quite a bit. My oral argument will be succinct. I want to deal first with outlining why the appellees believe that the appeal should be dismissed and then turn to the merits of any substantive issues with respect to the issues presented by the appeal. The appeal is equitably moot. The Ninth Circuit has a very strong policy, first expressed in Robert Farms in 1981, toward finding that an appeal is equitably moot when an appellant, such as this appellant, fails to even seek a stay pending appeal. Some 20-something years later, through the math, as noted in Matter of Mortgages in 2014, the Ninth Circuit actually berated itself for the few instances in which it deviated from that very clear and simple rule. Yeah, but if you look more recently at the case law, isn't it true that as much finger-wagging as goes on at the Ninth Circuit about failing to seek a stay, they go ahead and analyze all the other issues, don't they? They do. I mean, for example, the reason why they do is because it's the failure to seek a stay that makes all these things problematic, right? The other issues are really derivative of the failure to seek a stay. Yeah, but they're certainly related, right, I would say. Judge Lafferty, I think that the more times that this panel or the Ninth Circuit does that and it actually berated itself and could sort of beat itself in the Matter of Mortgages and say, I don't know why we continue to deviate from this clear rule. We should really enforce this except in very narrow exceptions so that we don't have to look beyond this. And the important thing that they realized in Matter of Mortgages is that by enforcing that clear rule and what it said in Matter of Mortgages is appellants are on notice. You had ample notice that if you don't even seek a stay of the appeal, even if you feel it's futile and wordless, that your appeal is going to be denied, is going to be dismissed as actually moot. Well, isn't that an argument, though, to make to the circuit? Because, you know, looking at the jurisprudence as it's developed, yes, there's some very strong statements that way. And, yes, there's just totally ignoring it on the other side. They haven't been consistent. So I think it's an interesting argument. I'd love the circuit to – we like clear rules. But I'm not sure that when you say we ignore it – Well, I'm not saying that you ignored it. I would not accuse this panel. But your decision, right, the BAP decision, clearly saying that, look, we are going to follow it, we are going to follow the general rule as laid out in Matter of Mortgages, adds strength to that notice to people to seek a stay, which is clearly what the Ninth Circuit wants. But, look, it's also discretionary, right? And we could decide that the merits are important enough here. Let's get to them. We're spending a lot of time on something we don't really need to spend a lot of time on. Even though it's an interesting academic discussion. Because the other three factors in Matter of Thorpe Insolation, where the Ninth Circuit in 2012 adopted a four-factor test, the first factor being whether or not to call in for a stay, are all met. Substantial consummation of the plan under Bankruptcy Code Section 1101 has occurred. The assets have been transferred to a liquidating trustee. The liquidating trustee for a year now has been administering the estate, has been settling disputed claims with third parties. They have an expectation that they settle their claim, they receive payment. Mr. Pidcock's declaration now submitted four months ago because this appeal was put off, talks about the dollars that have already been disbursed. So all of those things, I mean, the plan has been substantially consummated. I don't think there's any argument about that. But overturning confirmation would affect all of those third parties, right, that have settled their claims and have moved on, have received payments, with the expectation that they would keep those payments. And I don't know about the 1,200 other ESOP participants that are not represented by counsel in this appeal. I don't know to what extent they've said on their rights or may have done other things to the extent that they didn't believe the plan was confirmed and that payments would soon be coming once the estate was administered. So when would those payments be coming? You said substantially consummated. What's left to be done? But for appellants and their continued appeals and continued arguments, I mean, I'm testifying from the podium. I'm going to talk quite a bit about evidence in this case because there is no evidence. The bankruptcy court found quite clearly. So I don't want to testify and seem kind of hypocritical. But to the best of my understanding, there's not much to be done other than ‑‑ And you're not state anyway, right? There is no state. The liquidating trustee is continuing to investigate. Do as you please at the moment, right? The main thing to be done, paying the ESOP participants. There is litigation. A liquidating trustee has been investigating, has been taking depositions. And it may or may not bring claims and actions. But if I might get off of equitable mootness and turn to other reasons that the case should be dismissed, there were issues here that are not raised below that are attempted to be argued on appeal. Appellants issue number four alleges that the court erred by allowing the CPES ESOP trustee to vote the class 6 interest. Certainly took issue with how that vote came about and what they thought the class 6 should have done. But the ESOP trustee's capacity as the holder of the class 6 equity interest was not challenged in the bankruptcy court. 1126A says ‑‑ I mean, between 1126A and 1126D, that tells the bankruptcy court this is who can vote. It's two different issues, right? I mean, who gets to vote is one issue. How that person supposedly derives how they're going to vote is a different issue. And the second one, you could argue, is not the bankruptcy court's business. Well, it would have been had they brought a motion under 1126E to designate the vote. But they didn't do that, and they can't do that here and they can't do that now. So issue four should clearly be struck. We still have issue one, and we'll get to that in a moment. But issue three alleges that the court erred by failing to appoint a Chapter 11 trustee or converting a case. That's remarkable because neither in the objection to confirmation nor the response to the memorandum of law nor anywhere in the transcript of the confirmation proceeding did they ask for a trustee to be appointed or the case to be converted. That was the subject of a prior motion and an order by the bankruptcy court. Was that order final and appealable at the time rendered? It was a denial, right? It was a denial. And, you know, I could stand up here and argue that because it's always unclear. But even if it was interlocutory at the time that it was ordered, it became final on confirmation of the plan over a year ago, and no appeal of that order has been taken. Well, I think Commissioner McNutt is to take his side for a second. He might say that's just subsumed in this. It is subsumed in this, but, well, it's not subsumed in this because there was no argument on confirmation, and if the order appealed from is a confirmation order, interlocutory orders become final and you can appeal from them. But, you know, as courts have held, appeal is required to file a separate notice of appeal with respect to each judgment, each proceeding. There's no Ninth Circuit cases on this, but Judge Taylor in your district and the Secretary of California, Herrera v. Pons, actually collects cases. The courts are overwhelmingly in agreement that you have to file a separate notice of appeal with respect to every judgment, every order from which you appeal. You can't just say everything was in confirmation because what are the issues that are subject to appeal? This issue was not subsumed within the confirmation order. It wasn't touched in the confirmation order. It wasn't touched in the confirmation hearing, and I realize that I'm speaking very fast, but I'm watching my time click away, and there's other issues I want to get to. Can I direct something? Yes, certainly. Tell me. You're about to get in a second. You know, the arguments in the briefs are this mammoth fight between ESOP, ERISA, and the Chapter 11 process. Today I think we're getting a much more direct argument from Mr. McNutt that he wants something out of the process, and that's a different argument. So I would be very curious to know what your thoughts are with respect to, you know, if we do, quote, rescind the plan and we go back, do you want to address what I think is now the direction of his argument, that somehow, you know, they're creditors and or they should somehow be deemed to be creditors and they should be getting all kinds of rights and moving forward? Yes, of course.  I'll address your arguments. Look, they made a motion here to temporarily allow claims under Federal Bankruptcy Procedure 3018. That is a final order, and they didn't appeal it. And even if it wasn't a final order, which it was, again, they didn't appeal it when confirmation was ordered. They talk about the Merrimack Paper Company case and Indiana Jewelers, but there are two types of ERISA plans, right? You can elect to have your shares under the plan allocated to you, and once they're allocated to you, you can then put them to the corporation, right? But there's another type of ERISA plan in which you only have the right to payment from the ESOP Trust. And the reason there is for two, because under state charters, if you're a subchapter S corporation, as CPEZ Arizona is, you break your charter if you have more than 100 holders. And so in Internal Revenue Code section, I'm losing it, and I told myself to go to it, but I think it's 509. Give me a second. It's 409G. It says a plan doesn't fail, and an ERISA plan doesn't fail to be a qualified plan if it provides for that relief. In other words, if it doesn't provide that a terminated or retired employee can seek to have its shares allocated and put them back to the corporation. And so what Merrimack and Indiana Jewelers both recognized is that once an ERISA participant, an ESOP participant, elected to have those shares allocated, put them back to the corporation, they were creditors. They had a direct claim against the corporation. The corporation had a direct obligation to them. In both of those instances, the corporation issues a note because the corporation doesn't have that money necessarily and doesn't have to pay it right away. It can pay it over time. All of that is irrelevant because there is no evidence presented, and there was no evidence presented at the 3018 hearing that any of these participants, any of the appellants, had a right to put. And there couldn't be any evidence because they don't have that right under the CPEZ plan. So they're not creditors, and the court based its ruling on that, and no further evidence was presented. No evidence has been presented of any claims. And so the court can't be held to be in error. So let's just look at Class 3, the unsecured creditors class. There was a planned ballot summary. Nobody contested it. Nobody contested that the creditors there weren't holders, that 100% of the class didn't vote. But rather, all that they contest is that they should have been recognized as unsecured creditors. But again, they provided no evidence, and they could provide no evidence because they don't have such a right or the debtor doesn't have obligations directly to them. I want to go back for a moment and talk about dismissal, if I might. There are also issues that they didn't raise below. Or I'm sorry, there are other orders that they seek to appeal. So the order approving the sale, Issue No. 1, in the middle of that issue, broadly worded issue, says something about the bankruptcy court erred when it allowed the sale to go forward. Obviously, that order was final and was entered quite some time ago. The order denying motion to temporarily allow claims for voting purposes was final when it was rendered. It was not appealed, and we just went through that. And then the order denying appellant's motion to appoint a trustee may have been interlocutory, but even if it was, it became final and it wasn't appealed. But moreover, if we go to the merits of the argument, Bankruptcy Code 1104 talks about gross mismanagement. It talks about fraud, dishonesty. Of the current management, those words are in the code, in Bankruptcy Code Section 1104. And there's absolutely no evidence presented of any fraud or any mismanagement of the debtor in possession by current management. And on that basis, the court could not possibly have erred in its decision to deny that motion. They argue facial conflicts of interest. Do you want to address that? I'm sorry, your— They argue facial conflicts of interest, that the ties between current management and the plan representative, do you wish to address that? Well, I think what they argue is conflicts of interest mostly related to the FAAG reform. Right. That's not management. They moved to disqualify the FAAG reform, and moving for a trustee and moving to disqualify a counselor are two completely different things. The management is in charge of the debtor in possession. But again, no evidence of that. But with respect to the FAAG reform, the court can take judicial notice. The motion to disqualify was denied with respect to disqualification. FAAG was found to have, and I'll use the word inadvertently, not made a disclosure regarding connections. But the court found that there was no conflicts of interest and that was not disabling and that FAAG should not be disqualified, that it was qualified and represented the debtor as well. I'll turn to acceptance by Class VI, although I see I'm out of time. But again— I just want to give him some time for rebuttal. Yes. I'll give you two minutes if you give him two minutes. Certainly. Go ahead. Okay. With respect to acceptance by Class VI, again, 1126 gives us the statutory requirements, right? And no one has argued, nowhere, that the CPES ESOP trustee was not the holder of those equity interests. Rather, appellants and appellants made no motion to designate that vote. Rather, they argue that the bankruptcy court should have somehow modified 1126 to give them a vote. Or it argues that the CPES ESOP trustee should have polled and that was responsible to poll the various ESOP participants. I would note that there is no evidence anywhere in the record that the ESOP trustee didn't poll participants. And this is a common and recurring theme with these appellants, both below and here. They say things all the time in their papers, and they repeat them and they repeat them. And then when we argue that there's no evidence, they come back and say, oh, no, we've made that argument time and time again. Making an argument and having evidence are two completely different things. They continue to say that the debtor filed a plan that had releases for third parties or had releases for directors and officers. The debtor did no such thing, and there's no evidence otherwise. If we look at the First Amendment plan, and if we look at Slusher's testimony with respect to, it was, I think, in the disclosure statement hearing, he admits that the definition of released parties accidentally included the words directors and officers, and they struck those after looking at that and discussing it. But that first plan, and the Court can take judicial notice and look at it, also clearly indicated that there was no releases given to the debtors, officers, and directors, and there was no release of any third-party claims, independent claims that the CPEZ ESOP might have or any of the participants might have. So the fact that they recite things over and over again, they recite the fact that ESOP participants have repurchase obligations, they don't, and there's no evidence of it. The main complaint is that there was no polling of the ESOP participants. Well, the Court doesn't really know that, and the Bankruptcy Court doesn't know that, because there's no evidence of it, right? The CPEZ ESOP trustee cast his acceptance on March 15th, as reflected in the planned ballot summary, which is Appendix 41, and that planned ballot summary was filed on March 19th. Between March 19th and April 6th, there were no depositions taken, there was no testimony taken, there was no declaration by a single ESOP participant indicating that it had not been polled with respect to the way that the ESOP trustee cast its acceptance. But even if we accept the fact that the ESOP trustee may not have or didn't poll them, the Bankruptcy Court, nor the plan, nor the Bankruptcy Code prohibited in any way the ESOP trustee from doing that. And if they feel that the ESOP trustee breached a duty that it had to them, ESOP participants can, in a separate proceeding, seek to hold the ESOP trustee. That's not a matter of the estate, the ESOP trustee. That's not a release claim, it's not discharged, it's not anything, right? Correct. We need to stop because I lost track, but you're out of time. I'm sorry. We could talk forever. I'm going to give him exactly as much time as you got, which is 3 minutes and 24 seconds. I apologize. Judge Taylor, Judge Gann, Judge Lafferty, Judge Gann, I'll try to stay here. All of this is very polished and internally consistent, but it never answered your question, which is where would you go with all this and is there any place that these folks get a voice in any process on any issue? You can see how FAGRI has billed $3.5 million in this case regarding an organization that provided mental health services to the poor in Arizona. Many statements were made that I just can't make sense of. Judge Saltzman didn't enter any particular findings or conclusions and confirmation. If someone polled the ESOP participants, our participants account for over 35% by dollar value of all the claims. Wouldn't they have known? Sure, lots of things might have happened. I have covered the cost of this on my own back. I had to allocate where I filed appeals. I couldn't file 20 appeals, and I felt that focusing on confirmation was the place to go. Judge Lafferty makes a brilliant point that if someone has the right to cast a vote, that's different than whether the vote is cast corruptly, and in general I think that's true. But what I explained to Judge Saltzman in great detail on the record and in the pleading in opposition to plan confirmation was that it is simply impossible as a statutory matter that the plan fiduciary, Miguel Paredes, is protecting the interests of land participants, but the plan fiduciary who is Mark Monson, the president and CEO of the corporation, is giving him direction. Does the BAP believe that Mr. Monson, the CEO, this is a rhetorical question, the CEO and the chairman of the board, could have simply cast the vote? He would have been authorized. He has the same authority and the same statutory duty as Mr. Paredes. This is a tissue of lies. So, counsel, there's one issue that has been bothering me that you raised was, okay, you want to appeal and you come forward with your appeal. Why didn't you seek a stay? What's the reason? Because it would have been futile. So it would have been denied so there was no reason to suggest to people that you should ask for it? Our clients, even my resources reach an end, and our clients don't have any money to post a bond. And the bond would have been the amount of money that was being held is what you anticipate? That was the way I thought about it at the time, Judge Gant. It would have been futile. Futile meaning that it would have been denied, but more importantly you couldn't have afforded to put money up that would have been sufficient to cover what you anticipated would have been the amount of the bond. Yes, sir, it's to both points. All right. All right, thank you very much. We appreciate your good arguments, and we will take this matter under submission. Thank you. Thank you, Judge Taylor.
judges: Taylor, Lafferty, Gan